**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TAP PHARMACEUTICAL PRODUCTS, INC., TAKEDA CHEMICAL INDUSTRIES, LTD. and WAKO PURE CHEMICAL INDUSTRIES, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> ATRIX LABORATORIES, INC. and SANOFI-SYNTHELABO, INC., <br><br> Defendants. | No. 03 C 7822 <br> Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

Most of this patent battle is over. After patent construction, Defendants conceded infringement. The issue of whether the claims were invalid as obvious or anticipated was tried to a jury and lost. The dispute over whether the patent applicants had perpetrated inequitable conduct in the prosecution of the patent was tried before me and lost. What remains to be decided is the issue of damages (an issue bifurcated for later trial) and injunctive relief. It is this last matter I decide now.

This patent is aged, expiring on May 1 of this year. Plaintiffs want the injunction because they want to stop Defendants' marketing of Eligard, a drug delivery device that competes with Lupron Depot, Plaintiffs' product. Both products offer sustained release of the same drug – leuprolide acetate, an LHRH agonist – used in the treatment of advanced prostate cancer. There is little to show here that either product is clinically superior to the other in ordinary usage. The dispute centers over whether Eligard ought to be left on the market for the benefits it offers a

certain group of patients.

The patent holder is entitled, absent exceptional circumstances, to keep others from practicing its invention. *Richardson v. Suzuki Motor Co.,* 868 F.2d 1226 (Fed. Cir. 1989); *MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323 (Fed. Cir. 2005), *cert. granted*, 126 S.Ct. 733 (2005). Plaintiffs' rationale for pursuing the injunction is that Defendants have been marketing an infringing product for more than three years, appropriating someone else's property and benefitting from the delay in litigation during re-examination. Plaintiffs argue this ought to stop now, even if only for a few weeks. The rationale is legally unnecessary: the patent holder has a right to stop others from making and selling the invention for a good reason or for no reason. Defendants do not dispute this principle. Rather, they argue that the Eligard product is better than Lupron Depot in some ways and, to benefit those patients for whom it is better, it ought to be left on the market. Defendants essentially concede that, except for such patients, Eligard probably should not be made or sold for the remaining period of the patent.[1]

I find that there is no proof that Eligard is, in any meaningful way, superior to Lupron Depot. Defendants bear the burden of proving this superiority. Lupron Depot has been sold for many years and it costs about the same as Eligard. Though Eligard is a relative newcomer, it has been on the market for over three years yet has only achieved an insignificant market share in comparison to Lupron Depot. The purchasers of both products are Board Certified urologists well able to judge the superiority of one drug delivery system over another. Other District Judges

---

[1]No one can seriously doubt that the effective administration of an order which allowed the use of Eligard for certain patients, but not others, would be difficult to achieve and would result in too many sales of Eligard. There would be too many sales because any system that would allow an infringing product to be offered for reasons of public health ought to be over-inclusive, the benefit of the doubt being resolved in favor of using the infringing product.

have come to the same conclusion I reach here: that the failure over a number of years to secure a substantial share of the market over existing products is evidence (though not necessarily conclusive evidence) of the lack of superiority of the newer product, at least when the products are marketed to sophisticated purchasers.[2]  *See, e.g.*, *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 106 F. Supp. 2d 696 (D.N.J. 2000).

There are a scattering of studies addressing the two drugs at issue in this case. One expert, Dr. Perez-Marrero, reads these studies as demonstrating the slight superiority of Eligard. However, the studies also can be read not to demonstrate any superiority of Eligard. Dr. Atkinson, another expert, is clearly correct in his conclusion (based on common understandings of scientific method) that Dr. Perez-Marrero cannot, in a scientifically valid way, reach the conclusions he offers. I conclude that Dr. Perez-Marrero can *think* that Eligard may be superior but that there is no way that he can claim to *know* it. The studies on which he relies are simply too small and do not justify the conclusion offered by Defendants.

Defendants also offer the testimony of two clinicians who claim that switching from Eligard to something else would cause psychological harm to patients, perhaps even lessening the effectiveness of treatment. The basis for this opinion is not set forth,[3] nor do I find it persuasive. First, the drug in question is the same for both products: leuprolide acetate. A physician switching from one product to the other would not be justified telling a patient he is receiving a

---

[2]Lupron Depot is also easier to administer. Unlike Eligard, it need not be refrigerated and then warmed to room temperature and manually mixed before injection.

[3]One would expect that the premise that medical harm ensues because of the psychological effect of change in pharmaceutical manufacturer ought to be well-documented, as insurance companies force such changes often enough.

3

different medication. Moreover, the number of patients who would be changing from Eligard during the short period covered by the injunction is quite small. Additionally, the claimed psychological problems are likely to be non-existent or, if present, iatrogenic. There is also credible clinical evidence that a change of delivery systems is not medically significant. The two clinicians do not dispute, nor do Defendants, that patients will receive the medication they require even if Eligard is unavailable. Finally, I note that the FDA has not permitted Defendants to claim that Eligard is superior.

There are two ways in which the Eligard and Lupron Depot products are incontestably different. The first is that one version of the Eligard product requires two injections (one every six months) while Lupron Depot requires three injections (one every four months). It is unclear how many Eligard patients are on the six-month injection program but it does not appear to be large. Moreover, the only persons who will have to switch to one extra injection are those whose six-month treatment runs out in March or April of this year. The inconvenience to a small number of patients is not the sort of medical detriment that warrants the continuing sale of an infringing product.

The second is that Eligard is administered by subcutaneous injection while Lupron Depot is administered by intramuscular injection. There is evidence that some patients find intramuscular injection painful and bruising, but there are also patients who find subcutaneous injections painful. The real force of Defendants' argument on this point is not that a fair number of a few patients would suffer a little more with Lupron Depot. Rather, it is that some advanced prostate cancer patients lose a great deal of weight and muscle mass and that Lupron Depot becomes difficult to administer and, when administered, is very painful–perhaps causing patients

4

to refuse the drug.

Defendants' argument fails because there is a well-known alternative to Lupron Depot. This alternative, Zoladex (a product of AstraZeneca), is injected subcutaneously. Therefore, an injunction against Eligard will not force even a small number of patients into intramuscular injections.[4] Patients will not be damaged by an injunction and the existence of an alternative to Lupron Depot eliminates any ground for imposing a compulsory royalty regime on the parties. In sum, the injunction should issue. Plaintiffs are entitled to this remedy and the public interest is served, not impinged, by its issuance.

The parties also contest the scope of the proposed injunction. I have considered the parties' arguments and various drafts of the proposed injunction. Plaintiffs ask for an order recalling all Eligard products. These products were all made in violation of the law, which prohibits making an infringing product. I see no reason not to enter an order that prohibits Defendants from compounding the infringement that occurred when they made the product by selling the remaining product. Even if not sold, there remains the substantial risk of infringement by use. A recall of Eligard products now in the hands of physicians or distributors serves the purpose of insuring that they, deliberately or unwittingly, do not infringe.

Plaintiffs also want Defendants to stop promoting Eligard. It is within the power of a court to stop a defendant from promoting an infringing product for as long as the patent stands, just as a court can stop someone from promoting a security (even one not tainted by fraud) if state or federal registration requirements have not been met. *See Cable/Home Communication*

---

[4] Another product, Viadur, delivers the LHRH agonist for a period of one year though this is an implant rather than an injection.

*Corp. v. Network Prods., Inc.*, 902 F.2d 829, 849 (11th Cir. 1990). So, too, it is reasonable to enjoin Defendants, during sales calls on medical professionals, in solicitations to medical professionals, or in sales literature, from criticizing Plaintiffs or Lupron Depot for obtaining the injunction against Eligard. While Defendants have every right to criticize Plaintiffs, the law or the process in the usual public and governmental fora, they are prohibited from using the criticism as a marketing tool in communications directed to physicians.

Defendants have asked for permission to continue selling Eligard. They understandably fear that infringement occurring after the decision here (if not before) will increase the chances that a finder of fact would deem such sales wilful and, having found some sales wilful, might be more inclined to find pre-decision sales wilful. I decline to grant permission for continued sales on this ground. There has been no discovery on wilfulness, which was postponed. It may be that all of the infringement has been inadvertent or done in good faith. On the other hand, evidence may show a deliberate pattern of infringement. Unless I know which of those things is true, it would be improper for me to consider whether permission for continued sales should be granted.

I recognize that, in some circumstances, an infringer might be entitled to a safe harbor against a storm of wilful infringement allegations based upon post-judgment sales. This can only be justified by a public interest purpose or, perhaps, by proof at trial that infringement was not in any way wilful. I have found as a fact that the public interest purpose has not been proved and the proof regarding wilfulness is yet to be heard. Injunction to issue. ENTER

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: February 27, 2006