# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TAP PHARMACEUTICAL PRODUCTS INC., TAKEDA CHEMICAL INDUSTRIES, LTD., and WAKO PURE CHEMICAL INDUSTRIES, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> ATRIX LABORATORIES, INC. and SANOFI-SYNTHELABO INC., <br><br> Defendants. | No. 03 C 7822 <br> Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Plaintiffs wish to retain the services of Dr. Gregory K. Bell to serve as a witness against Defendants in an upcoming damages trial, which follows upon a finding that Defendants infringed a valid patent. Defendants hold Dr. Bell in some regard, since they too (along with Plaintiffs) retained him in connection with their (and Plaintiffs') defense against pending litigation over pharmaceutical pricing.[1] Defendants argue that two provisions of an agreement between TAP and Sanofi-Synthelabo and Dr. Bell's firm, Charles River Associates ("CRA"), preclude Plaintiffs from calling Dr. Bell as an adverse witness in this case.

The first provision states:

> If our firm is retained to provide services for an adversary of any of the Companies in other litigation related to AWP issues, the persons working on this [the pharmaceutical pricing case] engagement will not work on that engagement, and steps will be taken to ensure that confidential information relating to this

---

[1] In that controversy, Plaintiffs and Defendants are operating under a joint defense agreement.

> engagement is not disclosed to the persons working on that engagement.

CRA was retained pursuant to the agreement, and Dr. Bell and his team are working on the pharmaceutical pricing case.

Plaintiffs contend that the provision in the CRA agreement is inapplicable because the damages trial here does not involve "AWP issues" in the sense meant and understood by the signatories to the CRA agreement. Defendants respond, correctly, that Plaintiffs will have to address the subject of AWP (Average Wholesale Price) in this case. Plaintiffs' revenues are affected by AWP because payments for their drug are sometimes calculated either as a percentage of, or by reference to, the AWP. Plaintiffs' argument, however, is also correct. The conditions in the CRA agreement address a dispute very different from the dispute here. The "AWP issues" referred to in that agreement cannot fairly be construed to include the damages issue to be tried in this case.

The agreement itself refers to one pending case, *Swanton v. TAP Pharm. Prod. Inc. et al.*, CV 2002-004988 (Super. Ct. Ariz.), which is pending in the Superior Court of Arizona. It is a class action filed against what appears to be all, or nearly all, pharmaceutical companies dealing in "cancer drugs and other prescription drugs" and charges them with "a fraudulent marketing, pricing, sales and distribution scheme" causing governments, insurers and individuals "to overpay" for the drugs. It alleges that all Plaintiffs here as well as Defendant Sanofi (through Aventis) "engaged in a practice of deliberately inflating the AWP for prostate cancer drugs." Whereas the jury in the case before me will be asked to decide whether, and to what extent, the marketing and sale of Eligard caused lost profits through price erosion or lost sales to Plaintiffs,

they will not be asked to consider the issue of the fairness and accuracy of Plaintiffs' pricing practices.[2]

A group of cases now pending in United States District Court in Massachusetts raises issues similar to the claims made in the Arizona litigation (though there are far more lawyers appearing for the putative classes in Massachusetts since that case is proceeding under Multi-District Litigation practice.) *See In re Pharm. Indud. Average Wholesale Price Litig.,* 230 F.R.D. 61 (D. Mass. 2005). Several of Judge Saris's observations in her class certification ruling in that case are helpful in setting the factual background for my ruling here.[3] The following language is taken from Judge Saris's opinion.

> Throughout the class period, from 1991 to the present, AWP has been the pricing benchmark for most pharmaceutical sales in the United States. It is akin to a sticker price for automobiles, setting the pricing baseline. Private publications such as the Drug Topics Red Book, the First Data Bank Blue Book, and the Medi-Span Master Drug Data Base list the AWPs. For each drug, the publications list one or more eleven-digit National Drug Code numbers ("NDCs"), which convey information such as dosage, package size, and manufacturer; each NDC of a drug may have its own AWP.

---

[2] Defendant Sanofi does not intend to defend this damages suit on the ground that it agrees with the allegations made against it in the litigation over pricing, *e.g.*, that it tampered with AWP. Nor does it intend to prove that although it did not tamper with AWP, Plaintiffs did, and therefore are not entitled to damages based on "unfair" profit margins. This approach is reasonable, since it is undisputed that Lupron Depot (Plaintiffs' product) and Eligard (Defendants' product) share the same reimbursement code and were reimbursed at the same rate. Indeed, Defendants expressly state that they do not endorse the allegations made in the Arizona case and intend not to address those allegations in this case.

[3] Her observations relied "on the expert reports of the parties, the tutorials [including one given in part by Dr. Bell] on the structure of the . . . markets and the excellent report written by Professor Ernst Berndt." A copy of that report was provided to me along with the tutorial offered to Judge Saris by Dr. Bell and Professor Fiona Scott Morton.

Dr. Berndt states:
> To knowledgeable industry observers, it has long been widely understood that in the U.S. pharmaceutical industry, the term "average wholesale price" [AWP] is a misnomer: it is not a measure of prices generally paid by wholesalers to manufacturers, it is not a measure of prices frequently paid by retail or mail order pharmacies to wholesalers, nor is it some average of these.

Nonetheless, "real and understandable" confusion still remains, even within the industry, as to what AWP is. Mockingly referred to as "Ain't What's Paid," AWP has been defined in the literature in various ways. For example, according to the American Society of Consultant Pharmacists' website, First Data Bank stated as late as 2000 that AWP is "the average wholesale price." That is, AWP is the average of the prices charged by the national drug wholesalers for a given product (NDC). The operative word is "average." Other recent documents continue to state that AWP is an actual average of prices, even as government reports and other sources have stated that AWP is not an accurate measure of wholesale prices.

Related to the AWP is a drug's Wholesale Acquisition Cost ("WAC"), which also is listed in publications. WAC is understood to be the price at which a pharmaceutical firm typically sells a drug to wholesalers. The WAC for single-source drugs correlates with the AWP over the life of a drug. Typically, the AWP for a brand-name, self-administered drug is 20% or 25% above WAC. In the generic drug context the relationship is less predictable, with AWPs sometimes reaching 50% to 100% above WAC.

In almost every sale of prescription drugs, reimbursement from the government or TPP [Third Party Payor] is based on AWP, WAC, or a discount from one of these numbers (e.g., AWP minus 15%). As plaintiffs' expert Hartman states, "The AWP, or its formulaic equivalent the WAC (Wholesale Acquisition Cost), is interpreted by industry as the signal for the underlying structure of list and transaction prices for almost all drugs." However, manufacturers actually sell drugs to providers like pharmacies and doctors at prices far below AWP and WAC. This creates a "spread" between the price healthcare providers pay to acquire drugs from wholesalers or manufacturers (the average acquisition cost, "AAC") and the reimbursement rate paid by TPPs, the government,

> and consumers making co-insurance payments or paying the entire cost of a drug. This spread can reach into the hundreds of dollars and thousands of percentage points.
>
> The gravamen of the fraudulent scheme alleged in the SAMCC [Second Amended Master Consolidated Complaint] is that defendant manufacturers send publishers their AWPs (or their WACs), knowing that TPPs and government payors consider them indicators of prices to providers. Defendants know that class members will make reimbursement payments based on those prices. In fact, plaintiffs allege, for the 321 identified drugs, the AWPIDS, AWPs are neither the true average prices charged by wholesalers nor the price measure "expected" by the market (e.g., AWP minus 16% to 33% is the cost to providers). Instead, defendants (or wholesalers) sell a drug to retailers at a *net* price often significantly below the expected "AWP minus 16% to 33%" threshold by utilizing hidden discounts, off-invoice rebates, free samples, education grants, and other promotional means that are not reflected in the list price. Defendants do so to increase their market share or sales, at a cost to the end-payor. Under plaintiffs' theory, class members have been defrauded by intentionally false misrepresentations as to AWP that permit retailers and intermediaries like PBMs [pharmacy benefit managers] to retain the benefits of price reductions. Plaintiffs allege that the scheme led to huge profits for drug companies and doctors at the expense of insurers and their beneficiaries.

*In re Pharm. Indus.*, 230 F.R.D. 61 at 67-69 (footnotes and citations omitted).

The issue described by Judge Saris is, quite clearly, not the issue to be heard here. Whether or not pharmaceutical manufacturers' use of AWP constituted a fraud, the fact remains that AWP was used, at certain times and places, to determine what amounts were paid for Lupron Depot and Eligard. Defendants are free to show, if they can, that AWP fell over time (for whatever reason) so as to cause Plaintiffs' declining profits, or that the use of non-AWP measures reduced Plaintiffs' income. These, however, are facts related to income and profit. In the end, reduced AWP or non-AWP pricing standards may be shown to have great, moderate, or just a slight effect on Plaintiffs' profits. That does not change the fact that the justice and

5

fairness of AWP (or any alternative measure) is not at stake in this case.[4] The "AWP issues" contemplated in the CRA agreement are not relevant to the determination of the issue to be tried here.[5]

Defendants rely on a second passage of the CRA agreement in their effort to exclude Dr. Bell's testimony. It states:

> You and the Companies agree that we may continue [to consult] in any matter, including litigation . . . that is not substantially related to our work for the Companies in this matter, even if the interests of our clients in those other matters are directly adverse to the Companies, or any of their affiliates. Under such circumstances, the team working on the other matters will be separate from the team working on this matter. In particular, the separately constituted project teams will not, under any circumstances, exchange any data or information that might compromise the strictures of confidentiality governing each project.

On its face, this language appears to be an attempt to craft a provision complementary to the earlier passage dealing with work done on "AWP issues." This clause, however, covers litigation that is "not substantially related" to AWP issues. The remedy in both situations is the same: separate teams do the work and confidential information is not shared.

Defendants do not argue this point with much conviction, nor do Plaintiffs address this argument in their brief. It is difficult to know what to make of the provision regarding "not

---

[4]If it turns out that the class plaintiffs in the Massachusetts litigation successfully make their case of overpayment, the reward belongs in the pockets of the class, not in the pockets of the defendants.

[5]Even a brief reading of the materials and opinion from the Massachusetts case shows how far afield we would find ourselves if the "AWP issues" about which the CRA agreement speaks were raised here. The question is quite complex both in its details and in what I see as an implicit argument that one cannot properly be found to have tampered with a number when one cannot properly say what the true number is; particularly where its arbitrariness is recognized by many, including the government, and is subject to different definitions.

substantially related" matters. In first clause, which governs "AWP issues," there is a specific ban on having the same person or persons work on two separate projects. There is no such ban on matters "not substantially related," which adds an element of incoherency to the provision. Moreover, there is supposed to be no exchange of confidential information between the two teams. Yet, if all the people on one project were used to form a separate team on the second project, which is not expressly prohibited, then the confidentiality protection is meaningless, unless "exchanged" is understood to mean "used" in the second and separate project.[6]

Reading the word "exchange" as "use" makes sense, given the specific situation to which the language is addressed, and it has at least a minimum of lexical validity since "to exchange" is included in the meaning of "to use." Nor is this a tortured reading of the agreement's language. If a second, separate team is formed with fewer than all its members also comprising the first team, then the CRA agreement would ban the conveyance ("exchange") of confidential information possessed by team members to those who do not possess it; and ban those who possess it from using it in their work on the second team. I find this to be a coherent approach to managing potential conflicts, though its administration might be difficult.

An open issue remains with respect to decisions regarding what information from the pricing case(s) is confidential and what should be done to restrict the use of that information by Dr. Bell and his team. My current assumption is that Dr. Bell, as a damages expert in this case, will not necessarily have to use confidential information arising from his work on the AWP issues, and therefore, will not violate the second provision of the CRA agreement. I leave it to

---

[6]I am sure there is some history behind this clause; such vague language is usually drafted to meet a standard of the comfort level of the firm, its client or both, rather than a standard of clarity.

the parties to determine whether they can agree on what information should be held confidential and what rules and methods can be employed to ensure confidentiality as Dr. Bell prepares for this case. If there is disagreement, the matter should be brought to me, and I will resolve it promptly.

The motion for a protective order is denied.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: July 7, 2006